**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| PAUL MATTIGAN, HEIDI SHELL, AND JACQUELINE RAMSEY, on behalf of themselves and a class of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>ANNE ARUNDEL DERMATOLOGY, P.A.,<br>Defendant. | Case No. 1:25-cv-2476<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs, Paul Mattigan, Heidi Shell, and Jacqueline Ramsey, individually and on behalf of all others similarly situated ("Plaintiffs"), bring this action against Defendant Anne Arundel Dermatology, P.A. ("Anne Arundel" or "Defendant"), seeking monetary damages, restitution, and/or injunctive relief for the proposed Class, as defined below. Plaintiffs make the following allegations upon information and belief, the investigation of his counsel, and personal knowledge or facts that are a matter of public record.

## I. INTRODUCTION

1. The release, disclosure, and publication of sensitive, private data can be devasting. Not only is it an intrusion of privacy and a loss of control, but it is a harbinger of identity theft: for victims of a data breach, the risk of identity theft more than quadruples.[1] A data breach can have grave consequences for victims for years after the actual date of the breach—with the obtained information, thieves can wreak many forms of havoc: open new financial accounts, take out loans, obtain medical services, obtain government benefits, and/or obtain driver's licenses in the victims'

[1] Dave Maxfield & Bill Latham, *Data Breaches: Perspectives from Both Sides of the Wall*, 25 S.C. LAWYER 28-35 (May 2014), https:// https://articlegateway.com. (last visited June 27, 2024).

names, forcing victims to maintain a constant vigilance over the potential misuse of its information. Moreover, the release disclosure, and publication of private medical information, such as diagnosis, medications and prescriptions can lead to sophisticated and costly insurance fraud, as well as embarrassment, humiliation and blackmail.

2. Defendant Anne Arundel provides medical, pediatric, and surgical dermatology services along with cosmetic and dermatopathology services."[2]

3. As Defendant has now admitted, "Anne Arundel Dermatology ("AAD") recently identified an intrusion on certain of its systems by an unauthorized third party. We took immediate action to review the incident and secure our systems. Our review determined that certain data files were accessible to the unauthorized third party for a period of time. We subsequently performed an assessment of these data files and determined, on May 20, 2025, that some of the files contained certain personal or health information when the unauthorized third party had access to them. Our review indicates that the unauthorized access may have begun on February 14, 2025, and ended on May 13, 2025."[3] (the "Data Breach")

4. Subsequently, Defendant sent out Notice Letters dated July 11, 2025.[4] The Data Breach affected more than 1.9 million individuals.[5]

5. The letters sent to Plaintiffs vary in terms of the information impacted. For example, Plaintiff Heidi Shell's Notice Letter states: "the personal health information affected may include your date of birth, patient ID, medical record number, health history, and insurance information." While Plaintiff Paul Madigan's Notice Letter states: "the personal or health information affected

---

[2] *See* https://aadermatology.com/services/ (last visited July 24, 2025).
[3] https://classactionu.org/wp-content/uploads/2025/07/anne-arundel-dermatology-data-breach-notice-2025.pdf (last visited July 24, 2025).
[4] *Id.*
[5] https://www.hipaajournal.com/anne-arundel-dermatology-data-breach/ (last visited July 24, 2025).

may include your date of birth, patient ID, medical record number, health history, financial information, insurance information, and appointment history."

6. What is extraordinarily troubling about the Data Breach is that even though Defendant knew how valuable customer information is, Defendant failed to adequately protect Plaintiffs' and Class Members' Personal Identifiable Information ("PII") and Protected Health Information ("PHI"). This PII and PHI was compromised due to Defendant's negligent and/or careless acts and omissions and its utter failure to protect customers' sensitive data. Hackers targeted and obtained Plaintiffs' and Class Members' Private Information because of its value in exploiting and stealing the identities of Plaintiffs and Class Members. The present and continuing risk to victims of the Data Breach will remain for their respective lifetimes.

7. Anne Arundel has locations in seven states with over sixty offices.[6] It claims to be "[o]ne of the largest and most well-established dermatology practices in the Mid-Atlantic and Southeaster states."[7] Anne Arundel could easily have allocated a small portion of its revenue or assets toward cybersecurity and prevention to forestall and prevent the Data Breach. But Defendant chose profits over protection of patients most sensitive PII and PHI. As a result of the Data Breach, through which its PII and PHI was compromised, disclosed, and obtained by unauthorized third parties, Plaintiffs and Class Members have suffered concrete damages and are now exposed to a heightened and imminent risk of fraud and identity theft for a period of years, if not decades. Furthermore, Plaintiffs and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft, at their own expense. And they must make family and close friends aware that personal health information about Class Members could be used in fraud and phishing attempts targeting their friends and families. Consequently, Plaintiffs and the

---

[6] https://aadermatology.com/locations/ (last visited July 24, 2025).
[7] https://aadermatology.com/ (last visited July 25, 2025).

other Class Members will incur ongoing out-of-pocket costs for, e.g., purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft and other fraudulent behavior.

8. By this Complaint, Plaintiffs seek to remedy these harms on behalf of themselves and all similarly situated individuals whose private information was accessed during the Data Breach.

## II. PARTIES

### A. Plaintiff Paul Mattigan

9. Plaintiff Paul Mattigan is a citizen of and is domiciled in Baltimore City County, Maryland.

10. Plaintiff is or was a patient who has obtained health care services from Anne Arundel.

11. Plaintiff provided confidential and sensitive PII and PHI to Anne Arundel, in connection with Anne Arundel's provision of its services. Defendant obtained and continues to maintain Plaintiff's PII and PHI and has a legal duty and obligation to protect that PII and PHI from unauthorized access and disclosure.

12. Plaintiff would not have entrusted his PII and PHI to Defendant had he known that Defendant failed to maintain adequate data security.

13. Plaintiff learned about the Data Breach via the following Notice of Data Breach Letter sent via email dated July 14, 2025:

[redacted]

Visit:
https://response.idx.us/AAD

July 14, 2025

**Notice of Data Breach**

Dear Paul Madigan,

We write to notify you of a recent incident that could affect some of your personal or health information. Please review this letter carefully.

**What Happened**

Anne Arundel Dermatology ("AAD") recently identified an intrusion on certain of its systems by an unauthorized third party. We took immediate action to review this incident and secure our systems. Our review determined that certain data files were accessible to the unauthorized third party for a period of time. We subsequently performed an assessment of these data files and determined, on May 20, 2025, that some of the files contained certain personal or health information when the unauthorized third party had access to them. Our review indicates that the unauthorized access may have begun on February 14, 2025, and ended on May 13, 2025.

**What Information Was Involved**

From the review, we determined on June 27, 2025, that the personal or health information affected may include your date of birth, patient ID, medical record number, health history, financial information, insurance information, and appointment history. While we do not know whether the third party actually viewed or exfiltrated your information, we are sending you this notice as a precaution and to encourage you to take steps to monitor your information. At this time, we are not aware of any misuse of or fraudulent activity relating to anyone's personal or health information as a result of this incident.

**What We Are Doing**

After becoming aware of the incident, AAD undertook a review, working with third-party experts, to determine the nature and scope of the unauthorized access and confirm it was contained. After the review, we implemented additional security measures to help further protect against this type of incident going forward. As an added precaution, we are offering complimentary access to identity theft protection services through IDX at no cost to you. IDX identity protection services include: 24 months of credit and CyberScan monitoring, a $1,000,000 insurance reimbursement policy, and fully managed ID theft recovery services.

To enroll in the free identity protection services: call 1-855-202-7980, or go to https://response.idx.us/AAD and use the Enrollment Code provided above. IDX representatives are available Monday through Friday from 9 am - 9 pm Eastern Time. Please note the deadline to enroll is October 14, 2025.

**What You Can Do**

As always, we recommend that you remain vigilant for incidents of fraud and identity theft, including by regularly viewing your account statements and monitoring your free credit reports. For more information on how you can help protect yourself, please review the "Additional Resources."

**For More Information**

You will find detailed instructions for enrollment in the Additional Resources section. Also, you will need to reference the Enrollment Code at the top of this letter when calling or enrolling online, so please do not discard this letter.

If you have further questions or concerns, please call 1-855-202-7980 or go to https://response.idx.us/AAD.

We regret any concern or inconvenience caused by this incident.

Sincerely,
Vincent Bradley
Chief Executive Officer

Anne Arundel Dermatology
1306 Concourse Drive, #201
Linthicum Heights, MD 21090

**Additional Resources**

**Additional Details Regarding Your IDX Identify Protection Membership**

*Website and Enrollment.* Go to https://response.idx.us/AAD and follow the instructions for enrollment using your Enrollment Code provided at the top of the letter.

*Activate the credit monitoring* provided as part of your IDX identity protection membership. The monitoring included in the membership must be activated to be effective. Note: You must have established credit and access to a computer and the internet to use this service. If you need assistance, IDX will be able to assist you.

*Telephone.* Contact IDX 1-855-202-7980 to gain additional information about this event and speak with knowledgeable representatives about the appropriate steps to take to protect your credit identity.

**Monitor Your Accounts**

We recommend that you regularly review statements from your accounts and periodically obtain your credit report from one or more of the national credit reporting companies. You may obtain a free copy of your credit report online at https://www.annualcreditreport.com, by calling toll-free 1-877-322-8228, or by mailing an Annual Credit Report Request Form (available at https://www.annualcreditreport.com) to Annual Credit Report Request Service, P.O. Box 105281, Atlanta, GA, 30348-5281. You may also purchase a copy of your credit report by contacting one or more of the three national credit reporting agencies listed below.

- Equifax® – P.O. Box 740241, Atlanta, GA 30374-0241 – 1-800-685-1111 – https://www.equifax.com/personal/credit-report-services
- Experian – P.O. Box 9701, Allen, TX 75013-9701 – 1-888-397-3742 – https://www.experian.com
- TransUnion – P.O. Box 1000, Chester, PA 19016-1000 – 1-800-888-4213 – https://www.transunion.com

When you receive your credit reports, review them carefully. Look for accounts or creditor inquiries that you did not initiate or do not recognize. Look for information, such as home address and Social Security number, that is not accurate. If you see anything you do not understand, call the credit reporting agency at the telephone number on the report.

**Credit Freeze**

You have the right to put a security freeze, also known as a credit freeze, on your credit file, so that no new credit can be opened in your name without the use of a Personal Identification Number (PIN) that is issued to you when you initiate a freeze. A credit freeze is designed to prevent potential credit grantors from accessing your credit report without your consent. If you place a credit freeze, potential creditors and other third parties will not be able to access your credit report unless you temporarily lift the freeze. Therefore, using a credit freeze may delay your ability to obtain credit. Pursuant to federal law, you cannot be charged to place or lift a credit freeze on your credit report. Should you wish to place a credit freeze, please contact all three major consumer reporting agencies listed below.

- Equifax® – P.O. Box 105788, Atlanta, GA 30348-5788 – 1-800-685-1111 – https://www.equifax.com/personal/credit-report-services
- Experian – P.O. Box 9554, Allen, TX 75013-9554 – 1-888-397-3742 – https://www.experian.com/freeze/center.html
- TransUnion – P.O. Box 2000, Chester, PA 19016-2000 – 1-800-909-8872 – https://www.transunion.com/credit-freeze

You must separately place a credit freeze on your credit file at each credit reporting agency. The following information should be included when requesting a credit freeze: full name, with middle initial and any suffixes; Social Security number; month, day, and year of birth; current address and previous addresses for the past five (5) years; proof of current address, such as a current utility bill or telephone bill; and other personal information as required by the applicable credit reporting agency.

If you request a credit freeze online or by phone, then the credit reporting agencies have one (1) business day after receiving your request to place a credit freeze on your credit file report. If you request a lift of the credit freeze online or by phone, then the credit reporting agency must lift the freeze within one (1) hour. If you request a credit freeze or lift of a credit freeze by mail, then the credit agency must place or lift the credit freeze no later than three (3) business days after getting your request.

**Fraud Alerts**

You also have the right to place an initial or extended fraud alert on your file at no cost. An initial fraud alert lasts one (1) year and is placed on a consumer's credit file. Upon seeing a fraud alert display on a consumer's credit file, a business is required to take steps to verify the consumer's identity before extending new credit. If you are a victim of identity theft, you are entitled to an extended fraud alert, which is a fraud alert lasting seven (7) years. Should you wish to place a fraud alert, please contact any one of the agencies listed below. The agency you

- Equifax® – P.O. Box 105788, Atlanta, GA 30348-5788 – 1-888-766-0008 – https://www.equifax.com/personal/credit-report-services
- Experian – P.O. Box 9554, Allen, TX 75013-9554 – 1-888-397-3742 – https://www.experian.com/fraud/center.html
- TransUnion – P.O. Box 2000, Chester, PA 19016-2000 – 1-800-909-8872 – https://www.transunion.com/fraud-victim-resource/place-fraud-alert

**Additional Information**

You can further educate yourself regarding identity theft and the steps you can take to protect yourself, by contacting your state Attorney General or the Federal Trade Commission. Instances of known or suspected identity theft should be reported to law enforcement, your Attorney General, and the FTC.

- **The Federal Trade Commission** – 600 Pennsylvania Avenue, NW, Washington, DC 20580 – 1-877-438-4338 – TTY 1-866-653-4261 – https://www.ftc.gov/idtheft

**California Residents:** Visit the California Office of Privacy Protection (https://www.oag.ca.gov/privacy) for additional information on protection against identity theft. Office of the Attorney General of California, 1300 I Street, Sacramento, CA 95814, Telephone: 1-800-952-5225.

**District of Columbia Residents:** You can obtain information from the Office of the Attorney General for the District of Columbia about steps you can take to avoid identity theft: 400 6th Street NW, Washington, D.C. 20001 – 1-202-727-3400 – https://oag.dc.gov.

**Maryland Residents:** You can obtain information from the Maryland Attorney General about steps you can take to avoid identity theft: 200 St. Paul Place, 25th Floor, Baltimore, MD 21202 – 1-888-743-0023 – https://www.marylandattorneygeneral.gov.

**Massachusetts Residents:** Under Massachusetts law, you have the right to obtain any police report filed in regard to this incident. You also have the right to file a police report and obtain a copy of it if you are the victim of identity theft. Under Massachusetts law, you may also place, lift, or remove a security freeze on your credit reports, free of charge. You must place your request for a freeze with each of the three major consumer reporting agencies as detailed above.

**New Mexico Residents:** You have certain rights under the Fair Credit Reporting Act ("FCRA"), including: to know what is in your file; to dispute incomplete or inaccurate information; to have consumer reporting agencies correct or delete inaccurate, incomplete, or unverifiable information; as well as others. For more information about the FCRA, and your rights pursuant to the FCRA, please visit https://files.consumerfinance.gov/f/201504_cfpb_summary_your-rights-under-fcra.pdf.

**New York Residents:** You can obtain additional information regarding security breach response and identity theft prevention and protection from the New York Department of State Division of Consumer Protection. (1-800-697-1220; https://dos.ny.gov/consumer-protection) and the New York State Attorney General (1-800-771-7755; https://ag.ny.gov).

**North Carolina Residents:** You can obtain additional information about preventing identity theft from the North Carolina Attorney General: North Carolina Attorney General's Office - Consumer Protection Division, 9001 Mail Service Center, Raleigh, NC 27699-9001 – 877-566-7226 (Toll-free within North Carolina) – 919-716-6000 - https://www.ncdoj.gov.

**Rhode Island Residents:** Based on an analysis of the data to determine the affected individuals, we determined that the incident potentially affected 124 Rhode Island residents. You have the right to obtain any police report filed in regard to this incident. You also have the right to file a police report and obtain a copy of it if you are the victim of identity theft. You can obtain additional information from the Rhode Island Office of the Attorney General, Consumer Protection Division, 150 South Main Street, Providence, RI, 02903 – (401) 274-4400 – https://www.riag.ri.gov.

14. Plaintiff subsequently spent several hours taking action to mitigate the impact of the Data Breach, including researching the Data Breach, researching ways to protect himself from data breaches, and reviewing his financial accounts for fraud or suspicious activity. He now plans to spend several hours a month checking account statements for irregularities.

15. As a result of the Data Breach and the release of his PHI and PII, which he expected Defendant to protect from disclosure, Plaintiff has suffered emotional distress, including anxiety, concern, and unease about unauthorized parties viewing and potentially using his PHI and PII. As a result of the Data Breach, Plaintiff anticipates spending considerable time and money to contain the impact of the Data Breach.

**B. Plaintiff Heidi Shell**

16. Plaintiff Heidi Shell is a citizen of and is domiciled in Anne Arundel County, Maryland.

17. Plaintiff is or was a patient who has obtained health care services from Anne Arundel.

18. Plaintiff provided confidential and sensitive PII and PHI to Anne Arundel, in connection with Anne Arundel's provision of its services. Defendant obtained and continues to maintain Plaintiff's PII and PHI and has a legal duty and obligation to protect that PII and PHI from unauthorized access and disclosure.

19. Plaintiff would not have entrusted her PII and PHI to Defendant had she known that Defendant failed to maintain adequate data security.

20. Plaintiff learned about the Data Breach via the following Notice of Data Breach Letter dated July 11, 2025:



Anne Arundel DERMATOLOGY
P.O. Box 1907
Suwanee, GA 30024

[redacted]
Heidi Shell
[redacted]

[redacted]
SCAN ME
Or Visit:
https://response.idx.us/AAD

July 11, 2025

**Notice of Data Breach**

Dear Heidi Shell:

We write to notify you of a recent incident that could affect some of your personal or health information. Please review this letter carefully.

**What Happened**

Anne Arundel Dermatology ("AAD") recently identified an intrusion on certain of its systems by an unauthorized third party. We took immediate action to review this incident and secure our systems. Our review determined that certain data files were accessible to the unauthorized third party for a period of time. We subsequently performed an assessment of these data files and determined, on May 20, 2025, that some of the files contained certain personal or health information when the unauthorized third party had access to them. Our review indicates that the unauthorized access may have begun on February 14, 2025, and ended on May 13, 2025.

**What Information Was Involved**

From the review, we determined on June 27, 2025, that the personal or health information affected may include your date of birth, patient ID, medical record number, health history, and insurance information. While we do not know whether the third party actually viewed or exfiltrated your information, we are sending you this notice as a precaution and to encourage you to take steps to monitor your information. *At this time, we are not aware of any misuse of or fraudulent activity relating to anyone's personal or health information as a result of this incident.*

**What We Are Doing**

After becoming aware of the incident, AAD undertook a review, working with third-party experts, to determine the nature and scope of the unauthorized access and confirm it was contained. After the review, we implemented additional security measures to help further protect against this type of incident going forward. As an added precaution, we are offering complimentary access to identity theft protection services through IDX at no cost to you. IDX identity protection services include: 24 months of credit and CyberScan monitoring, a $1,000,000 insurance reimbursement policy, and fully managed ID theft recovery services.

To enroll in the free identity protection services: call 1-855-202-7980, go to https://response.idx.us/AAD, or scan the QR image and use the Enrollment Code provided above. IDX representatives are available Monday through Friday from 9 am - 9 pm Eastern Time. Please note the deadline to enroll is October 14, 2025.

21. Plaintiff subsequently spent several hours taking action to mitigate the impact of the Data Breach, including researching the Data Breach, researching ways to protect herself from data breaches, and reviewing her financial accounts for fraud or suspicious activity. She now plans to spend several hours a month checking account statements for irregularities.

22. As a result of the Data Breach and the release of her PHI and PII, which she expected Defendant to protect from disclosure, Plaintiff has suffered emotional distress, including anxiety, concern, and unease about unauthorized parties viewing and potentially using her PHI and

PII. As a result of the Data Breach, Plaintiff anticipates spending considerable time and money to contain the impact of the Data Breach.

**C. Plaintiff Jacqueline Ramsey**

23. Plaintiff Jacqueline Ramsey is a citizen of and is domiciled in Rowan County, Tennessee.

24. Plaintiff is or was a patient who obtained health care services from Anne Arundel.

25. Plaintiff provided confidential and sensitive PII and PHI to Anne Arundel, in connection with Anne Arundel's provision of its services. Defendant obtained and continues to maintain Plaintiff's PII and PHI and has a legal duty and obligation to protect that PII and PHI from unauthorized access and disclosure.

26. Plaintiff would not have entrusted her PII and PHI to Defendant had she known that Defendant failed to maintain adequate data security.

27. Plaintiff spent several hours taking action to mitigate the impact of the Data Breach, including researching the Data Breach, researching ways to protect herself from data breaches, and reviewing her financial accounts for fraud or suspicious activity. She now plans to spend several hours a month checking account statements for irregularities.

28. As a result of the Data Breach and the release of her PHI and PII, which she expected Defendant to protect from disclosure, Plaintiff has suffered emotional distress, including anxiety, concern, and unease about unauthorized parties viewing and potentially using her PHI and PII. As a result of the Data Breach, Plaintiff anticipates spending considerable time and money to contain the impact of the Data Breach.

**D. Defendant**

29. Defendant is a Maryland corporation, with its principal place of business located at 1306 Concourse Drive, Suite 201, Linthicum Heights, Anne Arundel County, Maryland, 21090.

## III. JURISDICTION AND VENUE

30. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1711, et seq., because at least one member of the Class, as defined below, is a citizen of a different state than Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

31. The Court has personal jurisdiction over this action because Defendant maintains its principal place of business in Linthicum Heights, Maryland, in this District, it has sufficient minimum contacts with this District, and has purposefully availed itself of the privilege of doing business in this District such that it could reasonably foresee litigation being brought in this District.

32. Venue is proper in this District under 28 U.S.C. § 1391(a) through (d) because Defendant's principal place of business is located in this District and a substantial part of the events or omissions giving rise to the claims occurred in, was directed to, and/or emanated from this District.

## IV. FACTUAL BACKGROUND

### A. Defendant failed to adequately protect customer data, resulting in the Data Breach.

33. In the course of its business, Defendant collects personal and health information from patients like Plaintiffs.[8] It also maintains medical records subject to the requirements and standards of the Health Insurance Portability and Accountability Act of 1996 (HIPAA).[9]

---

[8] https://classactionu.org/wp-content/uploads/2025/07/anne-arundel-dermatology-data-breach-notice-2025.pdf (last visited July 24, 2025).
[9] https://aadermatology.com/hipaa-privacy-notice/ (last visited July 24, 2025).

34. As a condition of providing services, Defendant receives, creates, and handles the PII and PHI of Plaintiff and Class Members.

35. Plaintiffs and Class Members must provide Defendant with their sensitive and confidential PII and PHI to receive Defendant's services. Plaintiffs reasonably expected that Defendant would safeguard their highly sensitive information and keep it confidential.

36. Due to the sensitivity of the PII and PHI that Defendant handles, Defendant is aware of its critical responsibility to safeguard this information—and, therefore, how devastating its theft is to individuals whose information has been stolen.

37. By obtaining, collecting, and storing Plaintiffs' and Class Members' PII and PHI, Defendant assumed equitable and legal duties to safeguard and keep confidential Plaintiffs' and Class Members' highly sensitive information, to only use this information for business purposes, and to only make authorized disclosures.

38. Despite the existence of these duties, Defendant failed to implement reasonable data security measures to protect the information with which it was entrusted and ultimately allowed nefarious third-party hackers to compromise Plaintiffs' and Class Members' PII and PHI.

39. Despite Defendant already having been fully aware of the Data breach since at least May 20, 2025, Defendant waited until approximately July 11, 2025 to mail and email notices to notify Plaintiffs and other Class Members that their information is in the hands of criminal hackers.

40. There are likely tens of thousands of consumers who do not yet know that their information was impacted by this data breach.

**B. Defendant was well aware of the need to take special care with consumers' PII, PHI, and Medical Information.**

41. On its Notice of Privacy Practices Page, Defendant states: "Anne Arundel Dermatology, its covered entity practice sites, and other affiliated entities are legally required to protect the privacy of your health information."[10]

42. Defendant made these representations concerning securing consumers PII and PHI because it knows and understands the severe consequences of losing this data.

43. As early as 2014, the FBI alerted the healthcare industry that they were an increasingly preferred target of hackers, stating "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining Protected Health Information (PHI) and/or Personally Identifiable Information (Personal Information)" so that these companies can take the necessary precautions to thwart such attacks.[11]

44. The healthcare industry has become a rich target for hackers: "High demand for patient information and often-outdated systems are among the nine reasons healthcare is now the biggest target for online attacks."[12] "The IT environments of healthcare organizations are often complex and difficult to secure. Devices and software continue to be used that have reached end-of-life, as upgrading is costly and often problematic. Many healthcare providers use software solutions that have been developed to work on specific – and now obsolete – operating systems and cannot be transferred to supported operating systems."[13]

---

[10] https://aadermatology.com/hipaa-privacy-notice/ (last visited July 24, 2025).

[11] Reuters, FBI warns healthcare firms they are targeted by hackers, August 20, 2014, http://www.reuters.com/article/us-cybersecurity-healthcare-fbi-idUSKBN0GK24U20140820 (last accessed June 28, 2024).

[12] *The healthcare industry is at risk*, SwivelSecure https://swivelsecure.com/ solutions/healthcare/healthcare-is-the-biggest-target-for-cyberattacks/ (last accessed June 28, 2024).

[13] Steve Alder, Editorial: *Why Do Criminals Target Medical Records*, HIPAA Journal (Oct. 14, 2022), https://www.hipaajournal.com/why-do-criminals-target-medical-records/#:~:text=Healthcare%20records%20are%20so%20valuable,credit%20cards%20in%20victims'%20names.

45. PII has considerable value and constitutes an enticing and well-known target to hackers. Hackers easily can sell stolen data as there has been a "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[14] PHI, in addition to being of a highly personal and private nature, can be used for medical fraud and to submit false medical claims for reimbursement.

**C. Defendant Failed To Comply With Regulatory Guidance And Industry-Standard Cybersecurity Practices.**

46. Defendant's data security failure stems from its failure to comply with state and federal laws and requirements as well as industry standards governing the protection of PII and PHI.

47. At least 24 states have enacted laws addressing data security practices that require that businesses that own, license or maintain PII to implement and maintain "reasonable security procedures and practices" and to protect PII from unauthorized access.

48. Defendant also failed to comply with Federal Trade Commission ("FTC") guidance on protecting PII and industry-standard cybersecurity practices. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, failing to use reasonable measures to protect PII by companies like Defendant. Several publications by the FTC outline the importance of implementing reasonable security systems to protect data. The FTC has made clear that protecting sensitive customer data should factor into virtually all business decisions.

49. The FTC recommends:

- limiting access to customer information to employees who have a business reason to see it;

[14] Brian Krebs, *The Value of a Hacked Company*, Krebs on Security (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/ (last accessed June 28, 2024).

- keeping customer information in encrypted files provides better protection in case of theft;
- maintaining up-to-date and appropriate programs and controls to prevent unauthorized access to customer information;
- using appropriate oversight or audit procedures to detect the improper disclosure or theft of customer information;
- monitoring both in- and out-bound transfers of information for indications of a compromise, such as unexpectedly large amounts of data being transmitted from your system to an unknown user; and,
- monitoring activity logs for signs of unauthorized access to customer information.[15]

50. The FTC has also issued numerous guides for businesses highlighting the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[16]

51. In 2016, the FTC updated its publication, *Protecting PII: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[17] The guidelines note businesses should protect the personal customer information that they keep; properly dispose of PII that is no longer needed; encrypt information stored on computer networks; understand its network's vulnerabilities; and implement policies to correct security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

---

[15] Federal Trade Commission, *Financial Institutions and Customer Information: Complying with the Safeguards Rule*, available at https://www.ftc.gov/tips-advice/business-center/guidance/financial-institutions-customer-information-complying (last accessed June 28, 2024).

[16] Federal Trade Commission, *Start With Security* at 2, available at https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last accessed June 13, 2024).

[17] Federal Trade Commission, *Protecting PII: A Guide for Business*, available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_protecting-personal-information.pdf (last accessed June 28, 2024).

52. The FTC recommends that businesses delete payment card information after the time needed to process a transaction; restrict employee access to sensitive customer information; require strong passwords be used by employees with access to sensitive customer information; apply security measures that have proven successful in the particular industry; and verify that third parties with access to sensitive information use reasonable security measures.

53. The FTC also recommends that companies use an intrusion detection system to immediately expose a data breach; monitor incoming traffic for suspicious activity that indicates a hacker is trying to penetrate the system; monitor for the transmission of large amounts of data from the system; and develop a plan to respond effectively to a data breach in the event one occurs.

54. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet its data security obligations.

55. The FTC has interpreted Section 5 of the FTC Act to encompass failures to appropriately store and maintain personal data.

56. According to the Federal Bureau of Investigation (FBI), phishing schemes designed to induce individuals to reveal personal information, such as network passwords, were the most common type of cybercrime in 2020, with such incidents nearly doubling in frequency between

2019 and 2020.[18] According to Verizon's 2021 Data Breach Investigations Report, 43% of breaches stemmed from phishing and/or pretexting schemes.[19]

57. On October 28, 2020, the FBI and two federal agencies issued a "Joint Cybersecurity Advisory" warning that they have "credible information of an increased and imminent cybercrime threat to U.S. hospitals and healthcare providers."[20] The Cybersecurity and Infrastructure Security Agency (CISA), the Department of Health and Human Services (HHS), and the FBI issued the advisory to warn healthcare providers to take "timely and reasonable precautions to protect its networks from these threats."[21]

58. Defendant was aware of its obligations to protect customers' PII, PHI and privacy before and during the Data Breach yet failed to take reasonable steps to protect customers from unauthorized access. In this case, Defendant was at all times fully aware of obligation to protect the PII and PHI of Defendant's customers because of its status as one of the largest and most well-established dermatology practices in the Mid-Atlantic and Southeastern states. Defendant was also aware of the significant repercussions if it failed to do so because Defendant collected PII and PHI from millions of consumers and knew that this PII and PHI, if hacked, would result in injury to consumers, including Plaintiffs and Class Members.

59. Based upon the known details of the Data Breach and how it occurred, Defendant also failed to fully comply with industry-standard cybersecurity practices, including, but not

---

[18] *2020 Internet Crime Report*, FBI, https://www.ic3.gov/Media/PDF/AnnualReport/2020_IC3Report.pdf (last accessed June 28, 2024).

[19] *2021 DBIR Master's Guide*, VERIZON, https://www.verizon.com/business/resources/reports/dbir/2021/masters-guide/ (subscription required) (last accessed June 28, 2024).

[20] *Ransomware Activity Targeting the Healthcare and Public Health Sector*, JOINT CYBERSECURITY ADVISORY, https://us-cert.cisa.gov/sites/default/files/publications/AA20-302A_Ransomware%20_Activity_Targeting_the_Healthcare_and_Public_Health_Sector.pdf (last accessed June 28, 2024).

[21] *Id.*

limited to, proper firewall configuration, network segmentation, secure credential storage, rate limiting, user-activity monitoring, data-loss prevention, and intrusion detection and prevention.

**D. Defendant failed to comply with HIPAA's data security requirements.**

60. Defendant is covered by HIPAA (see 45 C.F.R. § 160.102) and is required to comply with the HIPAA Privacy Rule and Security Rule.[22] These rules establish national standards for the protection of patient information, including protected health information, defined as "individually identifiable health information" which either "identifies the individual" or where there is a "reasonable basis to believe the information can be used to identify the individual," that is held or transmitted by a healthcare provider. See 45 C.F.R. § 160.103.

61. HIPAA prohibits unauthorized disclosures of "protected health information" and it requires that Defendant implement appropriate safeguards for this information. HIPAA requires that entities covered by its rules, including Defendant, provide notice of a breach of unsecured protected health information—i.e., non-encrypted data—without unreasonable delay and in no case later than 60 calendar days after discovery of a breach.

62. Following a data breach at a HIPAA covered entity, the HIPAA Omnibus Rule dictates it "must now undertake a four-factor risk assessment to determine whether or not PHI has been compromised and overcome the presumption that the breach must be reported." The four-factor risk assessment includes:

a) the nature and extent of the PHI involved in the incident (e.g., whether the incident involved sensitive information like social security numbers);

b) the recipient of the PHI;

[22] 45 C.F.R Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

c) whether the PHI was actually acquired or viewed; and,

d) the extent to which the risk that the PHI was compromised has been mitigated following unauthorized disclosure (e.g., whether it was immediately sequestered and destroyed)."[23]

63. The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, requires HIPAA covered entities and its business associates to provide notification following a breach of unsecured protected health information.

64. Defendant failed to comply with these HIPAA requirements and, indeed, its own privacy practices. Defendant did not:

a) Maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b) Adequately protect Plaintiffs' and the Class Members' PII and PHI;

c) Ensure the confidentiality and integrity of electronically protected health information created, received, maintained, or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

d) Implement technical policies and procedures for electronic information systems that maintain electronically protected health information to allow access only to those persons or software programs that have been granted access rights, in violation of 45 C.F.R. § 164.312(a)(1);

e) Implement adequate policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 C.F.R. § 164.308(a)(1)(i);

---

[23] 78 Fed. Reg. 5641-46; see also 45 C.F.R. § 164.304.

f) Implement adequate procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports, in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

g) Protect against reasonably anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 C.F.R. § 164.306(a)(3);

h) Take safeguards to ensure that Defendant's business associates adequately protect protected health information;

i) Conduct the four-factor Risk Analysis following the Data Breach;

j) Properly send timely notice to Plaintiffs and the Classes pursuant to 45 C.F.R. §§ 164.400-414;

k) Ensure compliance with the electronically protected health information security standard rules by its workforce, in violation of 45 C.F.R. § 164.306(a)(4); and/or

l) Train all members of its workforce effectively on the policies and procedures with respect to protected health information as necessary and appropriate for the members of its workforce to carry out its functions and to maintain security of protected health information, in violation of 45 C.F.R. §164.530(b).

**E. The Data Breach puts Plaintiffs and Class Members at increased risk of fraud and identity theft.**

65. Defendant's failure to keep Plaintiffs' and Class Members' PII secure has severe ramifications. Given the sensitive nature of the PII and PHI stolen in the Data Breach—dates of birth, patient IDs, medical record numbers, health history, insurance information, and appointment history—hackers can commit identity theft, financial fraud, and other identity-related fraud against

Plaintiffs and Class Members now and into the indefinite future. As a result, Plaintiffs have suffered injury and face an imminent and substantial risk of further injury including identity theft and related cybercrimes due to the Data Breach.

66. There is little doubt that consumers PII and PHI from the Data Breach will be circulating on the dark web, as it is highly valuable. Malicious actors use PII and PHI to, among other things, gain access to consumers' bank accounts, social media, and credit cards. Malicious actors can also use consumers' PII and PHI to open new financial accounts, open new utility accounts, obtain medical treatment using victims' health insurance, file fraudulent tax returns, obtain government benefits, obtain government IDs, or create "synthetic identities."[24]

67. Further, identity thieves often wait months or years to use PII and PHI obtained in data breaches, as victims often become complacent and less diligent in monitoring their accounts after a significant period has passed. These bad actors will also re-use stolen PII and PHI, meaning individuals can be the victim of several cybercrimes stemming from a single data breach. Moreover, although elements of some Plaintiffs' and Class Members' data may have been compromised in other data breaches, the fact that the Breach centralizes the PII and PHI and identifies the victims as Defendant's customers materially increases the risk to Plaintiffs and the Class.

68. The U.S. Government Accountability Office determined that "stolen data may be held for up to a year or more before being used to commit identity theft," and that "once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years."[25] Moreover, there is often significant lag time between when a person suffers harm due to

---

[24] A criminal combines real and fake information to create a new "synthetic" identity, which is used to commit fraud.
[25] U.S. Gov't Accountability Off., GAO-07-737, Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown 42 (2007),

theft of its PII and PHI and when they discover the harm. Plaintiffs will therefore need to spend time and money to continuously monitor their accounts for years to ensure their PII and PHI obtained in the Data Breach is not used to harm them. Plaintiffs and Class Members thus have been harmed in the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of the Data Breach. In other words, Plaintiffs have been harmed by the value of identity protection services they must purchase in the future to ameliorate the risk of harm they now face due to the Data Breach.

69. Plaintiffs and Class Members have also realized harm in the lost or reduced value of their PII and PHI. Defendant admits the PII and PHI compromised in the Breach is valuable. Defendant collects, retains, and uses Plaintiffs' PII and PHI to earn revenue. Plaintiffs' PII and PHI are not only valuable to Defendant, but Plaintiffs also place value on their PII and PHI based on their understanding that their PII and PHI are a financial asset to companies who collect it.[26]

70. Plaintiffs and Class Members have also been harmed and damaged in the amount of the market value of the hacker's unauthorized access to Plaintiffs' PII and PHI that was permitted without authorization by Defendant. This market value for access to PII and PHI can be determined by reference to both legitimate and illegitimate markets for such information.

71. Moreover, Plaintiffs and Class Members value the privacy of this information and expect Defendant to allocate enough resources to ensure it is adequately protected. Customers would not have done business with Defendant, provided their PII and payment card information, or paid the same prices for Defendant's goods and services had they known Defendant did not

---

https://www.govinfo.gov/content/pkg/GAOREPORTS-GAO-07-737/html/GAOREPORTS-GAO-07-737.htm (last accessed June 13, 2024).

[26] *See, e.g.*, Ponemon Institute, LLC, *Privacy and Security in a Connected Life: A Study of US, European and Japanese Consumers* at p. 14 (March 2015) (explaining that 53% of respondents "believe personal data is a financial asset similar to traded goods, currencies or commodities" and valuing, as but one example, its Social Security number at $55.70), available at https://docplayer.net/836701-Privacy-and-security-in-a-connected-life-a-study-of-us-european-and-japanese-consumers.html.

implement reasonable security measures to protect their PII.[27] Customers reasonably expect that the payments they make to Defendant and those made on their behalf through government programs and insurance, incorporate the costs to implement reasonable security measures to protect customers' PII and PHI. And because consumers value data privacy and security, companies with robust data security practices can command higher prices than those who do not. As a result, Plaintiffs and Class Members did not receive the benefit of their bargain with Defendant because they paid for services they expected but did not receive.

72. Given Defendant's failure to protect consumers' PII and PHI, Plaintiff and the Class Members have a significant and cognizable interest in obtaining injunctive and equitable relief (in addition to any monetary damages, restitution, or disgorgement) that protects them from suffering further harm, as their PII and PHI remain in Defendant's possession. Accordingly, this action represents the enforcement of an important right affecting the public interest and will confer a significant benefit on the general public or a large class of persons.

73. In sum, Plaintiffs and Class Members were injured as follows: (i) theft of their PII and PHI and the resulting loss of privacy rights in that information; (ii) improper disclosure of their PII and PHI; (iii) loss of value of their PII and PHI; (iv) the lost value of unauthorized access to Plaintiffs' and Class Members' PII and PHI permitted by Defendant; (v) the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of the Data Breach; (vi) Defendant's retention of profits attributable to Plaintiffs' and Class Members' PII and PHI that Defendant failed to

---

[27] FireEye, *Beyond the Bottom Line: The Real Cost of Data Breaches* (May 11, 2016), https://www.fireeye.com/blog/executive-perspective/2016/05/beyond_the_bottomli.html (last accessed June 13, 2024) (noting approximately 50% of consumers consider data security to be a main or important consideration when making purchasing decisions and nearly the same percentage would be willing to pay more in order to work with a provider that has better data security. Likewise, 70% of consumers would provide less PII to organizations that suffered a data breach).

adequately protect; (vii) the certain, imminent, and ongoing threat of fraud and identity theft, including the economic and non-economic impacts that flow therefrom; (viii) ascertainable out-of-pocket expenses and the value of its time allocated to fixing or mitigating the effects of the Data Breach; (ix) overpayments to Defendant for goods and services purchased, as Plaintiffs reasonably believed a portion of the sale price would fund reasonable security measures that would protect their PII and PHI, which was not the case; and (x) nominal damages.

## V. CLASS ACTION ALLEGATIONS

74. Plaintiffs bring this action as a class action under Rule 23 of the Federal Rules of Civil Procedure, on behalf of a proposed nationwide class (the "Class"), defined as:

> All natural persons in the United States whose Personally Identifiable Information and/or Protected Health Information was compromised as a result of the Data Breach.

75. The Maryland Subclass is defined as follows:

> **Maryland Subclass:** All Class members who reside in the State of Maryland.

76. **Numerosity and Ascertainability:** Plaintiffs do not know the exact size of the Class or identity of the Class Members, since such information is in the exclusive control of Defendant. Nevertheless, the Class encompasses at least 1.9 million individuals dispersed throughout the United States. The number of Class Members is so numerous that joinder of all Class Members is impracticable. The names, addresses, and phone numbers of Class Members are identifiable through documents maintained by Defendant.

77. **Commonality and Predominance:** This action involves common questions of law and fact which predominate over any question solely affecting individual Class Members. These common questions include:

a. whether Defendant engaged in the conduct alleged herein;

b. whether Defendant had a legal duty to use reasonable security measures to protect Plaintiffs' and Class Members' PII and PHI;

c. whether Defendant timely, accurately, and adequately informed Plaintiffs and Class Members that their PII and PHI had been compromised;

d. whether Defendant breached its legal duty by failing to protect the PII and PHI of Plaintiffs and Class Members;

e. whether Defendant acted reasonably in securing the PII and PHI of Plaintiffs and Class Members;

f. whether Plaintiffs and Class Members are entitled to injunctive relief; and

g. whether Plaintiffs and Class Members are entitled to damages and equitable relief.

78. **Typicality:** Plaintiffs' claims are typical of the other Class Members' claims because all Class Members were comparably injured through Defendant's substantially uniform misconduct, as described above. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all other members of the Class that they represent, and there are no defenses that are unique to Plaintiffs. The claims of Plaintiffs and Class Members arise from the same operative facts and are based on the same legal theories.

79. **Adequacy:** Plaintiffs are an adequate Class representatives because their interests do not conflict with the interests of the other members of the Class they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The Class's interest will be fairly and adequately protected by Plaintiffs and their counsel.

80. **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other detriment suffered by Plaintiffs and other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be virtually impossible for the Class Members to individually seek redress for Defendant's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not: individualized litigation creates a potential for inconsistent or contradictory judgments, increases the delay and

expense to the parties, and increases the expense and burden to the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by this Court.

## VI. CAUSES OF ACTION

### A. Claims Brought on Behalf of the Nationwide Class

**COUNT ONE**
**NEGLIGENCE**

81. Plaintiffs incorporate the foregoing allegations 1 to 80 as if fully set forth herein.

82. Defendant owed a duty to Plaintiffs and Class Members, arising from the sensitivity of the information, the expectation the information was going to be kept private, and the foreseeability of its data safety shortcomings resulting in an intrusion, to exercise reasonable care in safeguarding its sensitive personal information. This duty included, among other things, designing, implementing, maintaining, monitoring, and testing Defendant's networks, systems, protocols, policies, procedures, and practices to ensure that Plaintiff's and Class Members' information was adequately secured from unauthorized access.

83. Defendant's Notice of Privacy Practices acknowledged Defendant's duty to adequately protect Plaintiffs' and Class Members' PII and PHI.

84. Defendant is covered by HIPAA (see 45 C.F.R. § 160.102) and, as such is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

85. Defendant owed a duty to Plaintiffs and Class Members to implement administrative, physical, and technical safeguards, such as intrusion detection processes that detect

data breaches in a timely manner, to protect and secure Plaintiffs' and Class Members' PII and PHI.

86. Defendant also had a duty to only maintain PII and PHI that was needed to serve customer needs.

87. Defendant owed a duty to disclose the material fact that its data security practices were inadequate to safeguard Plaintiffs' and Class Members' PII and PHI.

88. Defendant also had independent duties under Plaintiffs' and Class Members' state laws that required Defendant to reasonably safeguard Plaintiffs' and Class Members' PII and PHI and promptly notify them about the Data Breach.

89. Defendant had a special relationship with Plaintiffs and Class Members as a result of being entrusted with their PII and PHI, which provided an independent duty of care. Plaintiffs' and Class Members' willingness to entrust Defendant with their PII and PHI was predicated on the understanding that Defendant would take adequate security precautions. Moreover, Defendant was capable of protecting its networks and systems, and the PII and PHI it stored on them, from unauthorized access.

90. Defendant breached its duties by, among other things: (a) failing to implement and maintain adequate data security practices to safeguard Plaintiffs' and Class Members' PII and PHI, including administrative, physical, and technical safeguards; (b) failing to detect the Data Breach in a timely manner; and (c) failing to disclose that its data security practices were inadequate to safeguard Plaintiffs' and Class Members' PII and PHI.

91. But for Defendant's breach of duties, including the duty to use reasonable care to protect and secure Plaintiffs' and Class Members' PII and PHI, Plaintiffs' and Class Members' PII and PHI would not have been accessed by unauthorized parties.

92. Plaintiffs and Class Members were foreseeable victims of Defendant's inadequate data security practices. Defendant knew or should have known that a breach of its data security systems would cause damage to Plaintiffs and Class Members.

93. It was reasonably foreseeable that the failure to reasonably protect and secure Plaintiffs' and Class Members' PII and PHI would result in unauthorized access to Defendant's networks, databases, and computers that stored or contained Plaintiffs' and Class Members' PII and PHI.

94. As a result of Defendant's negligent failure to prevent the Data Breach, Plaintiffs and Class Members suffered injury, which includes, but is not limited to, exposure to a heightened and imminent risk of fraud, identity theft, and financial harm. Plaintiffs and Class Members must monitor their financial accounts and credit histories more closely and frequently to guard against identity theft. Plaintiffs and Class Members have also incurred, and will continue to incur on an indefinite basis, out-of-pocket costs for obtaining credit reports, credit freezes, credit monitoring services, and other protective measures to deter and detect identity theft. The unauthorized acquisition of Plaintiffs' and Class Members' PII and PHI has also diminished the value of the PII and PHI.

95. The harm to Plaintiffs and Class Members was a proximate, reasonably foreseeable result of Defendant's breaches of the aforementioned duties.

96. Therefore, Plaintiffs and Class Members are entitled to damages in an amount to be proven at trial.

## COUNT TWO
## NEGLIGENCE PER SE

97. Plaintiffs incorporate the foregoing allegations 1 to 80 as if fully set forth herein.

98. Under the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45, Defendant had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' PII.

99. In addition, under state data security statutes, Defendant had a duty to implement and maintain reasonable security procedures and practices to safeguard Plaintiffs' and Class Members' PII and PHI.

100. Defendant breached these duties to Plaintiffs and Class Members, under the FTCA and the state data security statutes, by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' PII and PHI.

101. Defendant is covered by HIPAA (45 C.F.R. § 160.102) and is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C. HIPAA prohibits unauthorized disclosures of "protected health information." which includes the information at issue here.

102. Plaintiffs and Class Members were foreseeable victims of Defendant's violations of the FTCA, HIPAA and state data security statutes. Defendant knew or should have known that the failure to implement reasonable measures to protect and secure Plaintiffs' and Class Members' PII and PHI would cause damage to Plaintiffs and Class Members.

103. Defendant's failure to comply with the applicable laws and regulations constitutes negligence *per se.*

104. But for Defendant's violation of the applicable laws and regulations, Plaintiffs' and Class Members' PII and PHI would not have been accessed by unauthorized parties.

105. As a result of Defendant's failure to comply with applicable laws and regulations, Plaintiffs and Class Members suffered injury, which includes but is not limited to the exposure to a heightened and imminent risk of fraud, identity theft, financial and other harm. Plaintiffs and Class Members must monitor their financial accounts and credit histories more closely and frequently to guard against identity theft. Plaintiffs and Class Members also have incurred, and will continue to incur on an indefinite basis, out-of-pocket costs for obtaining credit reports, credit freezes, credit monitoring services, and other protective measures to deter or detect identity theft. The unauthorized acquisition of Plaintiffs' and Class Members' PII has also diminished the value of the PII and PHI.

106. The harm to Plaintiffs and the Class Members was a proximate, reasonably foreseeable result of Defendant's breaches of the applicable laws and regulations.

107. Therefore, Plaintiffs and Class Members are entitled to damages in an amount to be proven at trial.

## COUNT THREE
## GROSS NEGLIGENCE

108. Plaintiffs incorporate the foregoing allegations 1 to 80 as if fully set forth herein.

109. Plaintiffs and Class Members entrusted Defendant with highly sensitive and inherently personal private data subject to confidentiality laws.

110. In requiring, obtaining and storing Plaintiffs' and Class Members' PII and PHI, Defendant owed a duty of reasonable care in safeguarding the PII and PHI.

111. Defendant's networks, systems, protocols, policies, procedures, and practices, as described above, were not adequately designed, implemented, maintained, monitored, and tested to ensure that Plaintiffs' and Class Members' PII and PHI were secured from unauthorized access.

112. Defendant's networks, systems, protocols, policies, procedures, and practices, as described above, were not reasonable given the sensitivity of the Plaintiffs' and Class Members' private data and the known vulnerabilities of Defendant's systems.

113. Defendant did not comply with state and federal laws and rules concerning the use and safekeeping of this private data.

114. Upon learning of the Data Breach, Defendant should have immediately disclosed the Data Breach to Plaintiffs and Class Members, credit reporting agencies, the Internal Revenue Service, financial institutions, and all other third parties with a right to know and the ability to mitigate harm to Plaintiffs and Class Members as a result of the Data Breach.

115. Despite knowing its networks, systems, protocols, policies, procedures, and practices, as described above, were not adequately designed, implemented, maintained, monitored, and tested to ensure that Plaintiffs' and Class Members' PII and PHI were secured from unauthorized access, Defendant ignored the inadequacies and was oblivious to the risk of unauthorized access it had created.

116. Defendant's behavior establishes facts evidencing a reckless disregard for Plaintiffs' and Class Members' rights.

117. Defendant, therefore, was grossly negligent.

118. Defendant's negligence also constitutes negligence per se.

119. The negligence is directly linked to injuries.

120. As a result of Defendant's reckless disregard for Plaintiffs' and Class Members' rights by failing to secure their PII and PHI, despite knowing its networks, systems, protocols, policies, procedures, and practices were not adequately designed, implemented, maintained, monitored, and tested, Plaintiffs and Class Members suffered injury, which includes but is not

limited to the exposure to a heightened, imminent risk of fraud, identity theft, financial and other harm. Plaintiffs and Class Members must monitor their financial accounts and credit histories more closely and frequently to guard against identity theft. Plaintiffs and Class Members also have incurred, and will continue to incur on an indefinite basis, out-of-pocket costs for obtaining credit reports, credit freezes, credit monitoring services, and other protective measures to deter or detect identity theft. The unauthorized acquisition of Plaintiffs' and Class Members' PII and PHI has also diminished the value of the PII and PHI.

121. The harm to Plaintiffs and the Class Members was a proximate, reasonably foreseeable result of Defendant's breaches of the applicable laws and regulations.

122. Therefore, Plaintiffs and Class Members are entitled to damages in an amount to be proven at trial.

**COUNT FOUR**

BREACH OF IMPLIED CONTRACTS

123. Plaintiffs incorporate the foregoing allegations 1 to 80 as if fully set forth herein.

124. Plaintiffs and Class Members were required to provide their PII and PHI to obtain services from Defendant. Plaintiffs and Class Members entrusted their PII and PHI to Defendant in order to obtain services from it.

125. By providing their PII and PHI, and upon Defendant's acceptance of such information, Plaintiffs and Class Members on one hand, and Defendant on the other hand, entered into implied contracts for the provision of adequate data security, separate and apart from any express contracts concerning the services provided, whereby Defendant was obligated to take reasonable steps to secure and safeguard that information.

126. Defendant had an implied duty of good faith to ensure that the PII and PHI of Plaintiffs and Class Members in its possession was only used in accordance with its contractual obligations.

127. Defendant was therefore required to act fairly, reasonably, and in good faith in carrying out its contractual obligations to protect the confidentiality of Plaintiffs' and Class Members' PII and to comply with industry standards and state laws and regulations for the security of this information, and Defendant expressly assented to these terms in its privacy policies as alleged above.

128. Under these implied contracts for data security, Defendant was further obligated to provide Plaintiffs and all Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their PII and PHI.

129. Plaintiffs and Class Members performed all conditions, covenants, obligations, and promises owed to Defendant, including paying for the services provided by Defendant and/or providing the PII and PHI required by Defendant.

130. Defendant breached the implied contracts by failing to take adequate measures to protect the confidentiality of Plaintiffs' and Class Members' PII and PHI, resulting in the Data Breach. Defendant unreasonably interfered with the contract benefits owed to Plaintiffs and Class Members.

131. Further, on information and belief, Defendant has not yet provided Data Breach notifications to affected Class Members who may already be victims of identity fraud or theft, or are at imminent risk of becoming victims of identity theft or fraud, associated with the PII or PHI that they provided to Defendant. These Class Members are unaware of the potential source for the compromise of their PII and PHI.

132. The Data Breach was a reasonably foreseeable consequence of Defendant's actions in breach of these contracts.

133. As a result of Defendant's conduct, Plaintiffs and Class Members did not receive the full benefit of the bargain, and instead received services that were of a diminished value as compared to the secure services they paid for. Plaintiffs and Class Members, therefore, were damaged in an amount at least equal to the difference in the value of the secure services they paid for and the services they received.

134. Neither Plaintiffs, nor Class Members, nor any reasonable person would have provided their PII and PHI to Defendant had Defendant disclosed that its security was inadequate or that it did not adhere to industry-standard security measures.

135. As a result of Defendant's breach, Plaintiffs and Class Members have suffered actual damages resulting from theft of their PII and PHI, as well as the loss of control of their PII and PHI, and remain in imminent risk of suffering additional damages in the future.

136. As a result of Defendant's breach, Plaintiffs and Class Members have suffered actual damages resulting from their attempts to mitigate the effect of the breach of implied contract and subsequent Data Breach, including, but not limited to, taking steps to protect themselves from the loss of their PII and PHI. As a result, Plaintiffs and the Class Members have suffered actual identity theft and the ability to control their PII and PHI.

137. Accordingly, Plaintiffs and Class Members have been injured as a result of Defendant's breach of implied contracts and are entitled to damages and/or restitution in an amount to be proven at trial.

## COUNT FIVE
## UNJUST ENRICHMENT

138. Plaintiffs incorporate the foregoing allegations 1 to 80 as if fully set forth herein.

139. Plaintiffs and Class Members conferred a monetary benefit on Defendant in the form of monetary payments—directly or indirectly—for services received.

140. Defendant collected, maintained, and stored the PII and PHI of Plaintiffs and Class Members and, as such, Defendant had knowledge of the monetary benefits conferred by Plaintiffs and Class Members.

141. The money that Plaintiffs and Class Members paid to Defendant should have been used to pay, at least in part, for the administrative costs and implementation of data management and security. Defendant failed to implement—or adequately implement—practices, procedures, and programs to secure sensitive PII and PHI, as evidenced by the Data Breach.

142. As a result of Defendant's failure to implement security practices, procedures, and programs to secure sensitive PII and PHI, Plaintiffs and Class Members suffered actual damages in an amount equal to the difference in the value between services with reasonable data privacy that Plaintiffs and Class Members paid for, and the services they received without reasonable data privacy.

143. Under principles of equity and good conscience, Defendant should not be permitted to retain money belonging to Plaintiffs and Class Members because Defendant failed to implement the data management and security measures that are mandated by industry standards and that Plaintiffs and Class Members paid for.

144. Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiffs and the Class all unlawful or inequitable proceeds received by Defendant. A constructive

trust should be imposed upon all unlawful and inequitable sums received by Defendant traceable to Plaintiffs and the Class.

## COUNT SIX
## DECLARATORY JUDGMENT

145. Plaintiffs incorporate the foregoing allegations 1 to 80 as if fully set forth herein.

146. Plaintiffs and the Class have stated claims against Defendant based on negligence, negligence per se and gross negligence, and violations of various state statutes.

147. Defendant failed to fulfill its obligations to provide adequate and reasonable security measures for the PII and PHI of Plaintiffs and the Class, as evidenced by the Data Breach.

148. As a result of the Data Breach, Defendant's system is more vulnerable to unauthorized access and requires more stringent measures to be taken to safeguard the PII and PHI of Plaintiffs and the Class going forward.

149. An actual controversy has arisen in the wake of the Data Breach regarding Defendant's current obligations to provide reasonable data security measures to protect the PII and PHI of Plaintiff and the Class. Defendant maintains that its security measures were—and still are—reasonably adequate and denies that they previously had or have any obligation to implement better safeguards to protect the PII and PHI of Plaintiff and the Class.

150. Plaintiffs seek a declaration that Defendant must implement specific additional, prudent industry security practices to provide reasonable protection and security to the PII and PHI of Plaintiffs and the Class. Specifically, Plaintiffs and the Class seek a declaration that Defendant's existing security measures do not comply with its obligations, and that Defendant must implement and maintain reasonable security measures on behalf of Plaintiff and the Class to comply with its data security obligations.

**B. Claims Brought on Behalf of the Maryland Subclass**

**COUNT SEVEN**
**MARYLAND CONSUMER PROTECTION ACT**
**Md. Code Ann., Com. Law §§ 13-101, *et seq.***

151. Plaintiffs Paul Mattigan and Heidi Shell individually and on behalf of the Maryland Subclass incorporates the allegations set forth in Paragraphs 1-80 as if fully set forth herein. This claim is brought under the laws of Maryland.

152. Plaintiff Mattigan, Plaintiff Shell, and Maryland Subclass Members are "consumer[s]" under Md. Code Ann., Com. Law § 13-101(c)(1).

153. Defendant advertised, offered or sold goods or services in Maryland and engaged in commerce directly or indirectly affecting the people of Maryland.

154. Defendant engaged in "[d]eception, fraud, false pretense, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with …[a] consumer service." Md. Code Ann., Com. Law § 13-301(9)(i) including:

a. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiffs' and Maryland Subclass Members' PII and PHI, which was a direct and proximate cause of the Data Breach;

b. Failing to identify and remediate foreseeable security and privacy risks and adequately improve security and privacy measures despite knowing the risk of cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Maryland Subclass Members' PII and PHI, including

duties imposed by Md. Code Ann., Com. Law §§ 14-3501, *et seq.* and the FTC Act, 15 U.S.C. § 45, which were a direct and proximate cause of the Data Breach;

d. Misrepresenting that it would protect the privacy and confidentiality of Plaintiffs' and Maryland Subclass Members' PII and PHI, including by implementing and maintaining reasonable security measures;

e. Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Maryland Subclass Members' PII, including duties imposed by Md. Code Ann., Com. Law §§ 14-3501, *et seq.* and the FTC Act, 15 U.S.C. § 45;

f. Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiffs' and Maryland Subclass Members' PII and PHI; and

g. Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Maryland Subclass Members' PII, including duties imposed by Md. Code Ann., Com. Law §§ 14-3501, *et seq.* and the FTC Act, 15 U.S.C. § 45.

155. Defendant failed to meet its statutory obligations under Maryland's Personal Information Protection Act, Md. Code Ann., Com. Law §§ 14-3501, *et seq.*, which is "an unfair or deceptive trade practice" and "subject to enforcement and penalty" under the MCPA. Md. Code Ann., Com. Law § 14-35508.

156. Defendant's representations and omissions were material because they were likely to deceive reasonable individuals about the adequacy of Defendant's data security and ability to protect the confidentiality of individual's PII and PHI.

157. Had Defendant disclosed to Plaintiffs and Maryland Subclass Members that its data systems were not secure and thus vulnerable to attack, Defendant would have been forced to adopt reasonable data security measures and comply with the law. Defendant was trusted with sensitive and valuable PII and PHI regarding millions of consumers and individuals, including Plaintiffs and the Maryland Subclass. Defendant accepted the responsibility of protecting the data, while keeping the inadequate state of their security controls secret from the public. Accordingly, Plaintiffs and the Maryland Subclass Members acted reasonably in relying on Defendant's misrepresentations and omissions, the truth of which they could not have discovered.

158. As a direct and proximate result of Defendant's unconscionable, unfair, and deceptive acts and practices, Plaintiffs and Maryland Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, as described herein, including but not limited to one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen PII and PHI; (iv) illegal sale of the compromised PII and PHI on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach reviewing bank statements, credit card statements, and credit reports, among other related activities; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of PII and PHI; lost value of access to PII and PHI permitted by Defendant; the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of Defendant's Data Breach; lost benefits of bargains as

well as overcharges for services or products; nominal and general damages; and other economic and non-economic harm.

159. Plaintiffs and Maryland Subclass Members seek all monetary and non-monetary relief allowed by law, including actual damages under and reasonable attorney's fees under Md. Code Ann., Com. Law § 13-408(a)-(b) and any other relief that is just and proper.

## VII. PRAYER FOR RELIEF

Plaintiffs, on behalf of themselves and on behalf of the proposed Classes, request that the Court:

a. Certify this case as a class action, appoint Plaintiffs as class representatives, and appoint Plaintiffs' Counsel as Class Counsel for Plaintiffs to represent the Classes;

b. Find that Defendant breached its duty to safeguard and protect the PII and PHI of Plaintiffs and Class Members that was compromised in the Data Breach;

c. Award Plaintiffs and Class Members appropriate relief, including actual and statutory damages, restitution, and disgorgement;

d. Award equitable, injunctive, and declaratory relief as may be appropriate;

e. Award all costs, including experts' fees and attorneys' fees, and the costs of prosecuting this action;

f. Award pre-judgment and post-judgment interest as prescribed by law; and

g. Grant additional legal or equitable relief as this Court may find just and proper.

## VIII. DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: July 28, 2025

Respectfully submitted,

*/s/ James J. Pizzirusso*
James J. Pizzirusso (Bar ID # 20817)
**HAUSFELD LLP**
1201 17th Street N.W.
Suite 600
Washington, D.C. 20036
Tel: 202.540.7200
jpizzirusso@hausfeld.com

Steven M. Nathan (Bar ID # 30618)
**HAUSFELD LLP**
33 Whitehall Street
14th Floor
New York, NY 10004
Tel: 646.357.1100
snathan@hausfeld.com

Thomas E. Loeser (*pro hac vice* to be filed)
Andrew Fuller (*pro hac vice* to be filed)
Ellen J Wen (*pro hac vice* to be filed)
**COTCHETT, PITRE & McCARTHY LLP**
1809 7th Ave.
Ste. 1610
Seattle, WA 98101
Tel: (206) 802-1272
tloeser@cpmlegal.com
afuller@cpmlegal.com
ewen@cpmlegal.com

*Attorneys for Plaintiffs and the Proposed Class*